**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **RUFUS LOWE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **No. 3:10-00857** |
| | )    **Judge Sharp** |
| **METROPOLITAN GOVERNMENT OF** | ) |
| **NASHVILLE AND DAVIDSON** | ) |
| **COUNTY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM

Plaintiff Rufus Lowe, a former Assistant Principal in the Metropolitan Nashville Public Schools ("MNPS") system brings this action alleging that he was discriminated against in violation of the Uniformed Services Employment and Re-Employment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*, and that he was subjected to a retaliatory discharge in violation of Tennessee common law. Defendant Metropolitan Government of Nashville and Davidson County ("Defendant" or "Metro") has filed a Motion for Summary Judgment (Docket No. 23) to which Plaintiff has responded (Docket No. 29) and Metro has replied (Docket No. 34). Additionally, Metro has filed a Motion to Strike the Affidavit of Dr. Dara Talibah (Docket No. 37), to which Plaintiff has responded in opposition.

For the following reasons, Metro's Motion for Summary Judgment will be granted with respect to Plaintiff's state law claim for retaliatory discharge, but denied with respect to Plaintiff's claim under USERRA. Metro's Motion to Strike will be denied.

# I.  FACTUAL BACKGROUND

To place the parties' arguments in context, the relevant facts need only be briefly summarized.  Those facts will be expanded upon where necessary for purposes of the legal discussion.

Plaintiff was an Assistant Principal in the MNPS system from June 2006 until April 2010. During that period, and for a number of years previously, he also served in the United States Army, attaining the rank of Major.

Plaintiff began his tenure as an Assistant Principal at McGavock High School.  In 2008, the Tennessee Department of Education took over administration of McGavock and issued a directive in July 2008 that Plaintiff and another Assistant Principal be reassigned from McGavock and replaced with other administrators.

Dr. Mildred Saffell-Smith, the new principal at McGavock informed Plaintiff in July or August 2009 that he was being reassigned.  On September 14, 2008, a few days before Plaintiff was reassigned,  Dr. Saffell-Smith sent him an email captioned "To Whom It May Concern," and which referenced a number of reasons why Plaintiff may not have succeeded at McGavock, including that he received multiple tasks without sufficient training to perform them, and he was assigned too many functions for one administrator to successfully perform.   The email also referred to Plaintiff's military service, stating:

> Additionally, Lowe is required to report for military training during the critical time of finalizing plans for the opening of school.  This required absence has occurred a number of successive years and did tremendously impact the orderly flow of systems for this fall.  He did make attempts to stay in touch with colleagues to support the operative plan provided.

(Docket No. 32-4).  Dr. Saffell-Smith concluded the email by stating that she believed the factors

she identified "are worthy of objective consideration of [Plaintiff's] abilities as an administrator as he moves into another placement," and noted that she "would be happy to clarify or discuss these and other points of concern in his behalf." (Id.). Plaintiff does not know to whom the email may have been sent, other than that he received a copy, and a copy was sent to Dr. June Keel ("Dr. Keel"), the Assistant Superintendent of Human Resources for MNPS.

Upon receipt of the email, Lowe contacted the Employer Support Guard Reserve ("ESGR"), an organization whose purpose is to protect veterans from being discriminated against in employment. Plaintiff informed ESGR that he was being demoted, and faxed the organization a copy of Dr. Saffell-Smith's email. Plaintiff was told by ESGR that MNPS would be contacted and a representative of the organization contacted Dr. Keel.

Dr. Keel believed that Dr. Saffell-Smith's email was supportive of Plaintiff, but she also thought that the email could be read differently. Dr. Keel claims that because the email could be read in different ways, and because she understood that it was unlawful to discriminate against someone based on his or her military status, she recommended that Plaintiff be placed back into another Assistant Principal position.

MNPS had no choice but to follow the Department of Education's directive, and Plaintiff was reassigned to the position of "planning facilitator" at the MNPS central office in September 2008, where he remained for less than one week. Plaintiff was then transferred to Pearl Cohn High School and reported for duty as an Assistant Principal on September 24, 2008, under Principal Marva Woods ("Woods").[1]

---

[1] Dr. Keel claims that, while recommending that Plaintiff be returned to a position as an Assistant Principal, she did not make the placement decision. Instead, that decision was made by the Leadership and Learning Department at MNPS.

Metro contends that sometime in the summer of 2009, Woods called Dr. Susan Kessler ("Dr. Kessler"), the Hunters Lane High School Principal, and asked if Dr. Kessler would trade one of her Assistant Principals for Plaintiff because that Assistant Principal was interested in running the freshman academy at Pearl Cohn, a program not offered at Hunters Lane. Plaintiff claims that Woods wanted him transferred from Pearl Cohn because she had a problem with his wife, and believes that contact was made with the Human Resources Department to effectuate a transfer.

Regardless of how it came about, Plaintiff was transferred to Hunters Lane where he remained for approximately one year. Shortly after his arrival as an Assistant Principal in July 2009, Plaintiff and other Assistant Principals were asked by Dr. Kessler to attend "inclusion training."[2] Plaintiff did not attend that training, nor did he inform Dr. Kessler that he would not attend. After Dr. Kessler was informed of Plaintiff's absence, he explained that he had not attended the training because he was on military duty.

Metro asserts that Plaintiff's unexplained absence from required training was just the start of a pattern of Plaintiff's performance issues at Hunters Lane. It claims that throughout the year Plaintiff spent at Hunters Lane, he (a) repeatedly used his own discipline forms instead of MNPS-approved forms; (b) consistently spoke to students in what Dr. Kessler felt was an unnecessarily harsh manner; (c) was repeatedly late in submitting required paperwork; and (d) either failed to attend, or was late for, multiple meetings and job assignments, including in-service duty and bus duty.

Metro also claims that the final major performance issue arose in March 2010, when Plaintiff

_____

[2]Dr. Kessler explained in her deposition that "inclusion training" is a program "to make sure that exceptional education students are fully included." (Kessler Depo. Docket No. 32-5 at 6).

4

released the Twilight School[3] at Hunters Lane 51 minutes early without first obtaining Dr. Kessler's permission. This action, Metro insists, jeopardized funding for the entire program.[4]

Following the Twilight School incident, Plaintiff was given a written reprimand and a plan of assistance by Dr. Kessler. In response, Plaintiff sent the Human Resources Department a letter dated March 26, 2010, in which he began by stating he was "working in a culture of fear and intimidation" at Hunters Lane, his "many accomplishments [we] trivialized" and "minor infractions [we]re blown way out of proportion." (Docket No. 22-5 at 1). With regard to the Twilight School matter, Plaintiff stated that he decided to close the school early "in order to insure the safety of students due to anticipated large crowds" for a basketball tournament to be held at the school, and concerns over safety at the tournament had been previously brought to his attention on at least three occasions. (Id.).[5]

Subsequently, Dr. Kessler recommended to the MNPS Human Resources Department that Plaintiff's contract be non-renewed. After reviewing documentation submitted by Dr. Kessler, Dr. Keel supported that recommendation. Ultimately, Dr. Jesse Register, Superintendent of Schools, approved the recommendation and Plaintiff's contract was not renewed. The non-renewal was effective April 8, 2010, but Plaintiff was paid the remainder of his salary for that school year.

Based on these events, Plaintiff filed suit in this Court, alleging he was discriminated against

---

[3] The Twilight School is an after school tutoring program designed as an alternative for students who would otherwise be suspended from school.

[4] According to Metro, funding for the program is contingent on students being present at school for a certain amount of hours, which is commonly referred to as "seat time."

[5] As Metro points out, the letter made no mention of mistreatment based upon military status. Plaintiff did, however, point out in the letter that he had served "twenty years as an officer in the military." (Id. at 2).

because of his military service and was subjected to retaliation for complaining to ESGR in 2008. With regard to his claim under USERRA, Plaintiff alleges that he was discriminated against in violation of the Act because he was repeatedly transferred, and because his contract was not renewed.

## II.  APPLICATION OF LAW

### A.  Motion to Strike Affidavit of Dr. Dara Talibah

In response to Defendant's Motion for Summary Judgment, and to rebut Metro's contention that it was impermissible to release students from the Twilight School early, Plaintiff tendered the Affidavit of Dr. Dara Talibah ("Dr. Talibah"), a former teacher at Hunters Lane.  Metro moves to strike this Affidavit because Dr. Talibah was not properly disclosed under Fed. R. Civ. P. 26, and because Dr. Talibah does not state that Dr. Kessler was aware of the alleged practice of releasing students early from the Twilight School.

Under Rule 26 of the Federal Rules of Civil Procedure,

> A party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – must supplement or correct its disclosure or response:
> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"

Fed. R. Civ. P. 26(e)(1).   "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Plaintiff's counsel concedes that Dr. Talibah was not listed as a potential witness in the initial

disclosures. Counsel asserts, however, that "the only reason Dr. Talibah was not disclosed sooner

to Defendant is that Plaintiff did not become aware of the testimony she was capable of providing

via affidavit until less than twenty-four hours prior to the filing of his Response."  (Docket No. 39

at 2).  Counsel also claims that upon learning Dr. Talibah might have discoverable information, he

supplemented his disclosures to add her as a possible witness.

Given the representation made by counsel that he seasonably supplemented Plaintiff's

disclosures, the Court will not strike the affidavit for failure to comply with Rule 26.[6]  Moreover,

given counsel's representations that Dr. Talibah's testimony "is only being used to rebut an

argument of the Defendant," the initial disclosure requirements do not serve as a bar because Rule

26 explicitly exempts from disclosure "discoverable information . . . use[d] . . .solely for

impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(I).

As for Metro's claim that Dr. Talibah's fails to indicate whether Dr. Kessler knew of the

alleged practice of releasing the Twilight School early, this is not a basis for striking the affidavit

because it goes to the weight of Dr. Talibah's statement.  See, Ortiz v. Anchor Realty Const., Inc.

2011 WL 2441918 at *6 (S.D. Ohio 2011) ("Defendants overreach in their motion to strike by

relying on argument going more to the weight of Plaintiff's sworn testimony than its admissibility);

Powerscreen USA, LLC v. D & L Equip., Inc., 661 F.Supp.2d 705, 711 (W.D. Ky. 2009) ("The

motion to strike will be denied, however, as [plaintiff's] argument goes to the weight to be given the

documents).

---

[6] Even where a disclosure is untimely, Rule 37 serves as an automatic bar to untimely disclosures
unless the failure to make proper disclosures is harmless.  To the extent that Metro believes it necessary  to
depose Dr. Talibah, it should raise the issue at the upcoming pretrial conference, and the Court will consider
reopening discovery for that limited purpose, and consider allowing Metro to take Dr. Talibah's deposition
during the three week period between the pretrial conference and scheduled trial date.

**B. Motion for Summary Judgment**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

Metro moves for summary judgment on both of Plaintiff's claims. It argues that Plaintiff cannot establish a claim under USERRA because he cannot show that any adverse action was taken against him due to his military service, and his transfers into various positions and the non-renewal of his contract were based upon legitimate non-discriminatory reasons. Metro also argues that his retaliation claim under state law fails because it is preempted by USERRA.

In response to Defendant's Motion, Plaintiff "concedes that the transfers to other positions within Metro (McGavock High School, Pearl Cohn High School, and Hunters Lane High School) in and of itself do not rise to the level of USERRA discrimination because the transfers themselves do not constitute adverse employment consequences." Plaintiff also "concedes that his state law retaliatory discharge claims are preempted by federal USERRA law." (Docket No. 29-1 at 24-25). Instead, Plaintiff "argu[es] that the termination of his employment contract is the ultimate adverse employment consequence that allows him to bring a cause of action under USERRA." (Id. at 25). Accordingly, the Court focuses solely on whether Plaintiff has presented a triable USERRA claim

based upon the non-renewal of his contract.

"USERRA was enacted to prohibit discrimination against individuals because of their military service." Bobo v. United Parcel Service, Inc., 665 F.3d 741, 754 (6ᵗʰ Cir. 2012). "[B]ecause USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." Petty v. Metropolitan Government of Nashville-Davidson County, 538 F.3d 431, 446 (6ᵗʰ Cir. 2008).

The Act "provides, among other things, that '[a] person who is a member of ... a uniformed service shall not be denied ... retention in employment, ... or any benefit of employment by an employer on the basis of that membership, ... performance of service, ... or obligation.'" Id. (quoting, 38 U.S.C. § 4311(c)(1)). Accordingly, "[a]dverse employment actions are prohibited under USERRA 'if the person's ... obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such ... obligation for service.'" Hance v. Norfolk So. Ry. Co., 571 F.3d 511, 518 (6ᵗʰ Cir. 2009) (quoting 38 U.S.C. § 4311(c)(1)).

"In order to make out a USERRA retaliation claim, an employee bears the initial burden of showing, by a preponderance of the evidence, that his protected status was a motivating factor in the adverse employment action." Escher v. BWXT Y-12, LLC, 627 F.3d 1020, 1026 (6ᵗʰ Cir. 2010). "Protected status is a motivating factor if a truthful employer would list it, if asked, as one of the reasons for its decision," id. and, therefore, "'military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration.'" Petty, 665 F.3d at 446 (citation omitted).

In the absence of direct evidence, a plaintiff can establish a USERRA claim based upon

circumstantial evidence. That is, "[d]iscriminatory motivation can be inferred from a variety of considerations, including: '(1) proximity in time between the employee's military activity and the adverse employment action, (2) inconsistencies between the proffered reason and other actions of the employer, (3) an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and (4) disparate treatment of certain employees compared to other employees with similar work records or offenses.'" Id. (quoting, Hance, 571 F.3d at 518).

Taking all of the evidence in a light most favorable to Plaintiff, the Court finds that there are genuine issues of material fact concerning whether Plaintiff's military service was a motivating factor in the non-renewal of his contract.

Plaintiff's military status, and the possibility that such service could impact on Plaintiff's effectiveness, surfaced in the Summer of 2008 when Dr. Smith-Saffell allegedly asked Plaintiff to postpone his scheduled military training because he was needed at McGavok. According to Plaintiff, Dr. Smith-Saffell did not react favorably to the response that it was unlikely his orders could be changed. Thereafter, Dr. Smith-Saffell penned the "To Whom it May Concern" email.

Dr. Smith-Saffell reached the upper-echelon of MNPS management, landing on the desk of Dr. Keel, the Assistant Superintendent of Human Resources, and a decision-maker in relation to the non-renewal of Plaintiff's contract.[7] See, Escher, 627 F.3d at 1026 ("to establish actionable retaliation, the relevant decision maker, not merely some agent of the defendant, must possess knowledge of the plaintiff's protected activity"). That email was followed by a call from an official

---

[7] In her deposition, Dr. Keel testified that she and Dr. Kessler were the two individuals who participated in the decision not to renew Plaintiff's contract. (Docket No. 32-1, Keel Depo. at 43).

at ESGR in which the caller expressed concerns to Dr. Keel as to whether Plaintiff's military service was a factor in Plaintiff's repeated transfers. The email and subsequent inquiry were apparently alarming enough that Dr. Keel found it necessary to recommend that Plaintiff be transferred to a lateral position as an Assistant Principal, instead of being transferred into some other position.

Dr. Kessler, the other decision-maker in the non-renewal decision, was also aware of Plaintiff's military status. If Plaintiff's testimony is believed by a jury, his military status caused Dr. Kessler concern because she "constantly asked" Plaintiff "when [he] was going to retire from the military." (Pf. Depo. Docket No. 32-3 at 19). See, Hance, 571 F.3d at 519 (expressing concern about an employee "taking too much time off for the military," can show an anti-military bias). Plaintiff also claims that shortly after arriving at Hunter Lane, he was called for military training. When Plaintiff informed Dr. Kessler that he missed "inclusion training" pursuant to orders to report for duty, Dr. Kessler took it upon herself to call "Commander Harrington" to inquire about the validity of Plaintiff's excuse, even though that individual was not even Plaintiff's commanding officer.

As noted, military status is a motivating factor if an employer relied on, took into account, or considered that status in making the employment decision. A reasonable jury could conclude that Plaintiff's military status was a factor in the non-renewal of Plaintiff's contract because it was a matter of concern to the administration as early as 2008, and this concern carried over to Plaintiff's employment at Hunters Lane.

Where an employee shows that his or her military status was a motivating factor in the employment decision, the employer can defeat a claim under USERRA by "com[ing] forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the

11

adverse action anyway, for a valid reason.'" Escher, 627 F.3d at 1026 (citation omitted). Again, taking all of the evidence in a light most favorable to Plaintiff, the Court finds that there are genuine issues of material fact concerning whether Metro would have taken the same employment action in the absence of Plaintiff's military status.

Metro advances a host of reasons for the non-renewal of Plaintiff's contract, but, in its moving papers, focuses on two examples of Plaintiff's alleged deficiencies.

First, Metro cites Plaintiff's response to an email from Dr. Kessler. After Dr. Kessler inquired of Plaintiff, "Were you at bus duty outside this AM?", Plaintiff simply responded "No. . .". As Metro suggests, Plaintiff's response could be viewed as insubordination. But the response, arguably, could also be viewed as a direct and succinct response to Dr. Kessler's inquiry, or, given the ellipses, a response which would be expanded upon later. In any event, whether the curt response was a valid and real reason for termination is something for the jury to decide.

Second, Metro cites the Twilight School incident as the "final major performance issue," and argues that Plaintiff's early release of students "jeopardized funding for that entire program." However, and leaving aside the fact that funding continued unabated after the incident,[8] whether early release was truly problematic, and whether such action warranted non-renewal, are also questions of fact for the jury to decide.

While Dr. Kessler claimed in her deposition that there are no circumstances under which Twilight School can be released early, and that Twilight School has never been dismissed early except on March 8, 2010, there is evidence in the record from which a jury could conclude this, in fact, is not the case. According to Plaintiff, "every last one of" the Assistant Principals release the

_____

[8] In fact, except for some district wide interruptions, funding has actually increased.

Twilight School early, although, admittedly, not as early as Plaintiff. (Pf. Depo. Docket Entry No. 32-3 at 147). In fact, Plaintiff claims that days after he had been reprimanded, he returned to Hunters Lane to retrieve something he had forgotten and found some four or five Twilight School students milling about. He claims the encounter with the students occurred some twenty-five minutes before the Twilight School should have been released, and one of the students informed him that the Twilight School was released early every day. (Id.).

Additionally, Dr. Talibah states in her Affidavit that, on certain occasions,[9] the staff at the Twilight School was "permitted to release students eariler [sic] than usual." (Docket No. 31-2). Dr. Talibah also claims that "[n]o one was upset" about releasing students, it was done "in the best interest of all concerned," and, to her knowledge, no one, except Plaintiff, was ever reprimanded for the practice. While Dr. Talibah's Affidavit lacks details, and while she never states that Dr. Kessler either permitted or was aware of the practice, her statements coupled with Plaintiff's deposition testimony raise the specter that Dr. Kessler knew or should have known that the Twilight School was, in fact, released early and on more than one occasion.

In denying summary judgment on the USERRA claim, the Court recognizes that Metro claims Plaintiff had numerous performance issues, and it could well be that those performance issues, or even just some of them, were the actual reasons why his contract was not renewed. But it could also be that Plaintiff's military service was considered and taken into account when the decision was made to effectively terminate Plaintiff's employment, and that his military service was *a* motivating factor in Defendant's decision. Plaintiff has forwarded enough evidence to make those

---

[9] Dr. Talibah identifies those occasions as being when the school was short-staffed, there was inclement weather, other activities were scheduled in the building, and where there were concerns about discipline or gang-related conflicts.

questions for the jury.

### III. <u>CONCLUSION</u>

For the above reasons, Defendant's Motion for Summary Judgment will be granted with respect to Plaintiff's retaliatory discharge claim under state law, but denied with respect to Plaintiff's claim under USERRA. Defendant's Motion to Strike the Affidavit of Dr. Dara Talibah will be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE